# EXHIBIT A

Law Division Motion Section Initial Case Management Dates for 12 Persons(A,B,C,D,E,F,H,R,X,Z) will be heard In Person.
All other Law Division Initial Case Management Dates will be heard via Zoom
For more information and Zoom Meeting IDs go to https://www.cookcountycourt,org/HOME?Zoom-Links?Agg4906_SelectTab/12
Court Date: 4/1/2026 9:30 AM

FILED
2/3/2026 5:04 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2026L001329
Calendar, R
36492087

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION**

|  |  |
|---|---|
| **DEBORAH M. SARNO** and<br>**JOHN P. SARNO,** | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | )    Case No. 2026L001329 |
| **PHILIP MORRIS USA INC.,**<br>a Virginia for-profit corporation;<br>**R.J. REYNOLDS TOBACCO COMPANY,**<br>a North Carolina for-profit corporation;<br>**LIGGETT GROUP LLC,** a Delaware<br>for-profit limited liability corporation; and<br>**WALGREEN, CO.,** an Illinois corporation. | )<br>)<br>)    **JURY DEMANDED**<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

### COMPLAINT AT LAW

NOW COME, Plaintiffs, DEBORAH M. SARNO and JOHN P. SARNO, by and through

their attorneys, MEYERS & FLOWERS, LLC and THE ALVAREZ LAW FIRM and files this

Complaint at Law against the Defendants, PHILIP MORRIS USA INC., a foreign corporation

(Philip Morris), R.J. REYNOLDS TOBACCO COMPANY, a foreign corporation, (Reynolds)

LIGGETT GROUP LLC, a foreign corporation, (Liggett) and WALGREEN CO., an Illinois

corporation (Walgreens) and alleges as follows:

#### *Parties & Jurisdiction*

1.      At all times material Plaintiffs, Deborah M. Sarno and John P. Sarno were legally married and

       were residents of Cook County, Illinois. (hereinafter sometimes referred to as "Mrs. Sarno

       and Mr. Sarno or Plaintiff/Plaintiffs")

2.      Mrs. Sarno smoked cigarette products designed, manufactured, advertised, marketed,

       distributed and/or sold by the Defendants, including but not limited to Marlboro cigarettes

1

FILED DATE: 2/3/2026 5:04 PM 2026L001329

designed, manufactured, advertised, marketed, distributed and/or sold by defendant Philip Morris.

3.  Mrs. Sarno began smoking cigarettes in approximately 1970. She smoked Marlboro brand cigarettes until she successfully quit smoking cigarette products in 2014.

4.  Mrs. Sarno was diagnosed with lung cancer with metastasis in the brain, which were caused by the cigarettes designed, manufactured, advertised, marketed, distributed and/or sold by the Defendants named herein.

5.  Defendant, PHILIP MORRIS USA INC., is authorized to do and/or doing business within the jurisdiction of this Court, duly organized, created and existing under and by virtue of the laws of Virginia with its principal place of business in the State of Virginia that conducts business in every county within the State of Illinois and did so during all times relevant to this action. At all times material to this cause of action, said Defendant engaged in the design, manufacture, advertisement, marketing, distribution and/or sale of the Marlboro cigarette products, which Mrs. Sarno smoked and inhaled which caused and/or substantially contributed to the development of lung cancer with metastasis to the brain. Service of process over this Defendant may be had through its registered agent, United Agent Group Inc. 1320 Tower Road, Schaumburg, Illinois 60173-4309 and/or through service upon an officer or agent of this Defendant located at the Defendant's principal place of business.

6.  Defendant, R.J. REYNOLDS TOBACCO COMPANY, is authorized to do and/or doing business within the jurisdiction of this Court, duly organized, created and existing under and by virtue of the laws of North Carolina, with its principal place of business in the State of North Carolina that conducts business in every county within the State of Illinois and did so during all times relevant to this action. At all times material to this cause of action,

2

FILED DATE: 2/3/2026 5:04 PM    2026L001329

said Defendant engaged in the design, manufacture, advertisement, marketing, distribution and/or sale of cigarette products, which Mrs. Sarno smoked and inhaled which caused and/or substantially contributed to the development of her lung cancer with metastasis to the brain. Service of process over this Defendant may be had through its registered agent, Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, Illinois 62703, and/or through service upon an officer or agent of this Defendant located at the Defendant's principal place of business.

7. Defendant, LIGGETT GROUP LLC, (f/k/a LIGGETT GROUP, INC., f/k/a BROOKE GROUP, LTD., Inc., f/k/a LIGGETT & MYERS TOBACCO COMPANY), is a limited liability company authorized to do and/or doing business within the jurisdiction of this Court, duly organized, created and existing under and by virtue of the laws of Delaware with its principal place of business located in the State of North Carolina that conducts business in every county within the State of Illinois and did so during all times relevant to this action. At all times material to this cause of action, said Defendant engaged in the design, manufacture, advertisement, marketing, distribution and/or sale of cigarette products, which Mrs. Sarno smoked and inhaled which caused and/or substantially contributed to the development of her lung cancer with metastasis to the brain. Service of process over this Defendant may be had through its registered agent, C T Corporation System 208 So Lasalle St, Suite 814 Chicago, Illinois 60604, and/or through service upon an officer or agent of this Defendant located at the Defendant's principal place of business.

8. Defendant, WALGREEN, CO., is a corporation authorized to do and/or doing business within the jurisdiction of this Court, duly organized, created and existing under and by virtue of the laws of Illinois with its principal place of business located in the State of Illinois. Defendant

FILED DATE: 2/3/2026 5:04 PM   2026L001329

distributed and/or sold cigarettes which Mrs. Sarno purchased, smoked and inhaled which caused and/or substantially contributed to causing the development of her lung cancer with metastasis to the brain. Service of process over this Defendant may be had through its registered agent, Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, Illinois 62703, and/or through service upon an officer or agent of this Defendant located at the Defendant's principal place of business.

9.    Plaintiff's action is an action for damages in excess of the sum of FIFTY THOUSAND AND NO/100 ($50,000.00) DOLLARS.

10.   The wrongful conduct herein alleged, occurred, at least in part and/or the damages complained of by Mrs. Sarno were sustained in the county where the above styled Court sits, or the Defendant herein reside in the county where the above styled Court sits and thus venue of this action properly lies in this Court pursuant to Illinois law.

11.   Plaintiff resides in the State of Illinois and/or the Defendants against whom this action is brought resides in the county where the above styled Court sits and thus venue of this action properly lies in the Circuit Court of Cook County pursuant to Illinois law.

12.   The Plaintiff would further show that Defendant at all times material to this cause of action, through its agents, alter-egos, officers and representatives, operated, conducted, engaged in and carried on a business venture in this state and/or maintained an office or agency in this state; committed a tortious act within the state by allowing Mrs. Sarno to be exposed to an unreasonably dangerous product, to-wit: cigarette and/or cigarette smoke. Defendants failed to take any reasonable precautions or to exercise reasonable care to adequately or sufficiently warn Mrs. Sarno, or other persons similarly situated, of the risks, dangers and harm, to-wit: the contracting of the diseases of lung cancer, laryngeal cancer, emphysema, COPD, heart disease,

4

FILED DATE: 2/3/2026 5:04 PM    2026L001329

other forms of cancer, and other diseases and/or injuries to which she was exposed by smoking cigarettes, resulting from the ordinary and foreseeable use of said products, and said tortious conduct is continuing and presently existing; caused injuries and death, which arose out of the acts and/or omissions which occurred inside and outside of the State of Illinois during the relevant period of time, at which time Defendants were engaged in solicitation or service activities within the State of Illinois, resulting in injuries to Mrs. Sarno. Therefore, jurisdiction properly lies in this Court, as to Plaintiff's action, pursuant to Illinois law.

### *Allegations of the Tobacco Manufacturers' Unlawful Conduct Giving Rise to the Lawsuit*

13. In 2006, the United States brought civil racketeering charges against nine cigarette manufacturers—including the Defendants in this case—for "engaging in a lengthy, unlawful conspiracy to deceive the American public about the health effects of smoking and environmental tobacco smoke, the addictiveness of nicotine, the health benefits from low tar, 'light' cigarettes, and their manipulation of the design and composition of cigarettes in order to sustain nicotine addiction." *United States v. Philip Morris USA Inc.*, 449 F. Supp. 2d 1, 26–27 (D.D.C. 2006).

14. Finding Defendants in this case liable, the federal district court wrote:

> "It is about an industry, and in particular these Defendants, that survives, and profits, from selling a highly addictive product which causes diseases that lead to a staggering number of deaths per year, an immeasurable amount of human suffering and economic loss, and a profound burden on our national health care system. Defendants have known many of these facts for at least 50 years or more. Despite that knowledge, they have consistently, repeatedly, and with enormous skill and sophistication, denied these facts to the public, to the Government, and to the public health community. Moreover, in order to sustain the economic viability of their companies, Defendants have denied that they marketed and advertised their products to children under the age of eighteen and to young people between the ages of eighteen and twenty-one in order to ensure an adequate supply of "replacement smokers," as older ones fall by the

FILED DATE: 2/3/2026 5:04 PM    2026L001329

wayside through death, illness, or cessation of smoking. In short, Defendants have marketed and sold their lethal product with zeal, with deception, with a single-minded focus on their financial success, and without regard for the human tragedy or social costs that success exacted." *Id* at 28.

The D.C. Circuit Court of Appeals upheld these factual findings in 2009. *United States v. Philip Morris USA Inc.*, 566 F.3d 1095 (D.C. Cir. 2009).

15. Plaintiffs' lawsuit arises from the same factual basis, and relies on much of the same evidence, as the United States' lawsuit against Defendant.

16. Since 1953, the Defendants widely and continuously publicized false or misleading statements intended to deceive the American consumers, including but not limited to the following:

- that smoking is not addictive;
- that smoking is not injurious to health;
- that it is unknown if smoking causes serious diseases;
- that scientific and medical community has not reached a consensus about the harms of smoking;
- that no one knows what causes cancer;
- that the tobacco industry made an honest effort to study the harms of smoking and a causal relationship had not been proven; and
- that filter, low tar and low nicotine, light and ultra-light cigarettes are safe or safer.

17. However, as revealed by Defendants internal documents, at all times material to this action Defendants knew or had reason to know:

   a. that smoking cigarettes greatly increased the risk of a smoker developing esophageal cancer, lung cancer, emphysema, COPD, heart disease, other forms of cancer, suffering a stroke and/or sustaining other injuries and/or damages to the lungs, respiratory system, immune system, genetic makeup and other related physical conditions when used as intended;

6

FILED DATE: 2/3/2026 5:04 PM   2026L001329

b. that the diseases and/or injuries listed above would be more likely experienced if users such as the Smoker did not restrict their intake of Defendant's cigarettes, or if they began to use such products at an early age;

c. that use of the products as intended was more likely than not to lead to addiction, habituation, physical and/or psychological dependence, particularly if begun at an early age;

d. that termination or limitation of use would be exceedingly difficult if consumption was initiated and that this difficulty would increase as cumulative consumption increased;

e. that developing knowledge before and after 1970 demonstrated that previous users are at great risk of harm, as set forth above, and should seek medical monitoring;

f. that cigarette sellers could develop a reasonably safe dose for foreseeable users;

g. that there were feasible improvements in design, composition, or manufacture of cigarettes such as to materially decrease the foreseeable risk to users such as the Smoker;

h. that switching to or continuing to smoke filtered, low tar, low nicotine and/or "light" cigarettes would not be less hazardous because smokers would smoke more and/or alter their smoking habits such that their intake of tar, nicotine and other harmful substances would not be reduced; and

i. that the Federal Trade Commission ("FTC") method of measuring "tar & nicotine" levels underestimated and did not accurately reflect the levels of tar and nicotine actually delivered to an actual smoker.

18. Nevertheless, Defendants designed, manufactured, advertised, marketed, distributed and/or sold cigarettes which, when used as intended, were more likely than not to induce in foreseeable users like Mrs. Sarno a state of addiction, habituation, habit formation and/or dependence characterized by the user's inability to terminate or restrict his/her chronic use, which would more likely than not cause various illnesses, including lung cancer with metastasis to the brain.

19. Philip Morris USA Inc., RJ Reynolds Tobacco Company and Liggett Group LLC, the (Defendants) entered into a conspiracy with other manufacturers such as, American Tobacco

FILED DATE: 2/3/2026 5:04 PM   2026L001329

Company, Lorillard Tobacco Company, Brown and Williamson Tobacco Company, and British American Tobacco Company, ("Manufactures").

20. The Defendants engaged in a conspiracy to misrepresent the harms of smoking cigarettes, secondhand smoke, so-called "filter", "light", and "low tar" cigarettes, and the addictive qualities of nicotine. The co-conspirators include, but are not limited to, the "Defendants", British American Tobacco Company, American Tobacco Company, Lorillard Tobacco Company, and Brown & Williamson Tobacco Company, Committee of Counsel (CC), Ad Hoc Committee, Scientific Advisory Board, Tobacco Industry Research Committee (TIRC), Counsel for Tobacco Research (CTR), Hill and Knowlton, Special Projects, Tobacco Manufacturers' Association, AMA ERF, Center for Indoor Air Research ("CIAR"), the Associates for Research into the Science of Enjoyment ("ARISE"), and several other law firms. [1]

21. To effectively defraud and mislead American consumers like Mrs. Sarno, Defendants established and funded organizations like the Tobacco Industry Research Committee ("TIRC") and the Tobacco Institute ("TI") to attack valid scientific scholarship that proved a link between smoking and cancer, and to convince consumers that cigarettes are not dangerous.

22. The Defendants and their organizations maintained this misinformation campaign throughout Mrs. Sarno's childhood and teenage years as well as most of her adult life. It took form in various public statements such as:

    a. Calling the Surgeon General's 1979 report on cigarettes' link to cancer "suspect from the start;"

---

[1] These include some of the co-conspirators, please refer to Dr. Robert Proctor's reports and prior testimony for all others law firms and organizations involved in the conspiracy.

FILED DATE: 2/3/2026 5:04 PM   2026L001329

b. Press release titled "CLAIMS THAT CIGARETTES ARE ADDICTIVE CONTRADICT COMMON SENSE," which attacked the Surgeon General's 1988 report;

c. Defendant's CEOs' under-oath denial that cigarettes are addictive or cancer-causing in a 1994 congressional hearing, which was broadcast over national news networks;

d. Continuous public messaging that the tobacco industry was actively conducting and publishing honest scientific research on the link between smoking and cancer, and that it would not sell consumers, including Mrs. Sarno, a product that they knew would cause her cancer; and

e. Numerous TV, magazine, and billboard advertisements touting or implying the health benefits of filtered, or low-tar, or light, or ultra-light cigarettes.

### *Conspiratorial Involvement by General Counsel for Tobacco Companies & Outside Law Firms*

23. Philip Morris, Reynolds, Liggett, the (Defendants) entered into a conspiracy with other manufactures, which included the following: American Tobacco Company, Lorillard Tobacco Company, Brown and Williamson Tobacco Company, and British American Tobacco Company known as the (Manufactures).

24. Throughout the conspiracy, the Defendants Philip Morris, Reynolds, Liggett, and their co-conspirator manufacturers utilized attorneys – both in-house and outside counsel – to further their conspiracy to conceal and misrepresent the harms of smoking cigarettes, secondhand smoke, so-called "filter", "light", and "low tar" cigarettes, and the addictive qualities of nicotine. The Defendants, and their co-conspirators engaged in a fraud directed nationally and at the State of Illinois with these attorneys both before any litigation was contemplated, and once litigation against the tobacco companies began.

25. Philip Morris USA Inc., RJ Reynolds Tobacco Company, Liggett Group LLC, British American Tobacco Company, American Tobacco Company, Lorillard Tobacco Company, and Brown & Williamson Tobacco Company, collectively and through their general

9

FILED DATE: 2/3/2026 5:04 PM    2026L001329

counsel offices, formed an association known by differing names over time as the Committee of Counsel and/or the Counsel of Six ("CC"), whose purpose was to oversee, organize, operate, and execute a conspiracy to conceal and misrepresent the harms and addictive nature of cigarettes.

26.   Beginning in the 1950s Philip Morris USA Inc., RJ Reynolds Tobacco Company, Liggett Group LLC, British American Tobacco Company, American Tobacco Company, Lorillard Tobacco Company, and Brown & Williamson Tobacco Company, through the CC, retained outside counsel to assist them in their conspiratorial activities which included to conceal and misrepresent the harms of smoking and its addictive nature to the public.

27.   Philip Morris, Reynolds, Liggett, and their co-conspirators retained as outside counsel several law firms, including, SHOOK, COVINGTON, JMF, WOMBLE, and others.

28.   Beginning in the 1950s, and continuing during the relevant time periods, the CC and the outside law firms (hereafter "Lawyers") conspired with Philip Morris, Reynolds, Liggett, and their other co-conspirators and acted as agents, servants, representatives and/or employees of Philip Morris, Reynolds, Liggett, and their co-conspirators in furtherance of the conspiracy.

29.   The Lawyers played a central role in the creation and perpetuation of the conspiracy and the implementation of its fraudulent schemes throughout the United States as well as in Illinois, including but not limited to the following:

    a.   The Lawyers oversaw domestic smoking and health projects;

    b.   The Lawyers directed "scientists" as to what research they should and should not undertake;

    c.   The Lawyers were involved at every level of alleged scientific "research" pursued by Defendants and the tobacco industry;

FILED DATE: 2/3/2026 5:04 PM    2026L001329

d. The Lawyers devised and carried out document destruction policies and took shelter behind baseless assertions of attorney client privilege;

e. The Lawyers also worked with and coached scientists on how to be possible witness in litigation, how to speak at legislative hearings, how to serve as consultants, and how to conduct specific supposed research;

f. The Lawyers screened international scientists in order to eliminate those with views opposing the conspiracy;

g. The Lawyers directed and oversaw the false and misleading public positions and statements made by the Defendants and those through the TIRC/CTR and TI;

h. The Lawyers directed and oversaw false and or misleading submissions to public health authorities and governmental entities regarding the harms of smoke in cigarettes;

i. The Lawyers cleared cigarettes advertisements for the Defendants to ensure the continuation of the conspiracy;

j. The Lawyers directed a massive denial campaign to create false expectations about the safety of cigarettes smoke in general including smoking cigarettes and secondhand smoke;

k. The Lawyers provided false and misleading testimony and submissions to governmental agencies regarding the safety of cigarettes smoke in general including smoking cigarettes and secondhand smoke;

l. The Lawyers engaged and assisted the Defendants in conduct that the Lawyers knew was fraudulent;

m. The Lawyers hid the source of the money used for special projects to make them appear more acceptable to the public; and

n. The Lawyers ensured that Philip Morris, Reynolds, and the tobacco industry did not directly support legitimate projects related to smoking and health and instead directed the companies toward supporting alternative projects including junk science, attacks on legitimate public health research, and research of scientifically implausible alternative causation theories for smoking-related diseases.

## COUNT I: NEGLIGENCE (Philip Morris)

30. The allegations contained in paragraphs 1 through 29 are reincorporated and realleged as if fully set forth herein.

11

FILED DATE: 2/3/2026 5:04 PM    2026L001329

31.    This count applies to Defendant Philip Morris.

32.    Mrs. Sarno smoked Marlboro products that were designed, manufactured, advertised, marketed, distributed and/or sold by Defendant, which Mrs. Sarno used and smoked in her daily life.

33.    Mrs. Sarno was exposed to Defendant products as a smoker and/or bystander when she inhaled side stream smoke from others. Each exposure to such cigarette products of Defendant both first hand or second hand caused Mrs. Sarno to inhale smoke from said products which caused Mrs. Sarno to develop lung cancer with metastasis to the brain. Each exposure to such products was harmful and caused or contributed substantially to Mrs. Sarno's injuries. Mrs. Sarno's injuries arose out of, were connected to and incidental to the design, manufacture, advertisement, marketing, distribution and/or sale by Defendant of its cigarette products.

34.    Mrs. Sarno was exposed to and did inhale smoke (first and second hand) from cigarette products which were designed, manufactured, advertised, marketed, distributed and/or sold by Defendants.

35.    The damages of Mrs. Sarno are the direct and proximate result of the negligence of the Defendants, in that it produced, sold and otherwise placed into the stream of intrastate and interstate commerce, cigarette products which the Defendants knew, or, in the exercise of ordinary care should have known, were deleterious and highly harmful to Mrs. Sarno's health and well-being. Defendant, prior to selling and/or distributing its cigarette products, to which Mrs. Sarno was exposed, knew that exposure to cigarette smoke was harmful to human beings and that it could cause injuries including, but not limited to, lung cancer, esophageal cancer, emphysema, COPD, heart disease, other forms of cancer, and/or result in death. The

FILED DATE: 2/3/2026 5:04 PM    2026L001329

Defendant also knew that Mrs. Sarno and others similarly situated would use and be exposed to their cigarette products in such a way as to cause Mrs. Sarno to inhale (either first or second hand) the smoke from said products.

36.    Defendant's cigarette products, including Marlboro cigarettes, contained latent characteristics and/or latent functional defects at the time they were manufactured and at the time Mrs. Sarno was exposed to them in that said products contained tar, nicotine and other harmful substances which Defendants knew or in the exercise of reasonable care, should have known would cause injuries including, but not limited to, lung cancer, laryngeal cancer, emphysema, COPD, heart disease, other forms of cancer, and/or result in death, to those, such as Mrs. Sarno who used and/or was exposed to them.

37.    Defendants knew that its cigarette products would be used by and around Mrs. Sarno without inspection for defects and that any such inspection would not have advised Mrs. Sarno of the fact that the Defendant's cigarette products could cause the injuries which she suffered. Such facts made Defendant's cigarette products unreasonably dangerous in that Mrs. Sarno was not apprised of, could not and would not contemplate the danger and/or the extent of the danger of contracting the injuries as a result of her exposure to the inhalation of the cigarette smoke of Defendant's cigarette products which she used or was exposed to.

38.    Mrs. Sarno alleges that there were methods of design and manufacture of Defendant's cigarette products to which Mrs. Sarno was exposed that were available and/or known to Defendant, and unknown to her, which Defendant could have used in the design and manufacture of such products that would have made them less dangerous. Defendants were in the business of designing, manufacturing, advertising, marketing, distributing and/or selling cigarette products during the times pertinent to this suit, and knew that Mrs. Sarno and others

13

FILED DATE: 2/3/2026 5:04 PM    2026L001329

similarly situated would encounter its cigarette products, and would be exposed to the inhalation of the smoke from said products which resulted in the development of fatal and life-threatening injuries including, but not limited to, lung cancer with metastasis to the brain. Defendant was negligent in all the following respects, same being the proximate cause of Mrs. Sarno's injuries and disabilities which acts of negligence have continued to the present time:

a. in designing and developing cigarette products that were more mild, had better taste and contained nicotine so that foreseeable users, such as Mrs. Sarno, would find smoking Defendant's products pleasurable which in turn would lead the Plaintiff, and others similarly situated, to begin smoking and/or to increase consumption;

b. in failing to develop and utilize alternative design, manufacturing methods and/or materials to reduce and/or eliminate harmful materials and/or characteristics from the cigarette products Defendant designed, manufactured, advertised, marketed, distributed and/or sold;

c. in continuing to manufacture, distribute and sell cigarette products when Defendant knew at the time of said manufacture, distribution and/or sale that such products could cause, and in fact were more likely to cause, injuries including, but not limited to, emphysema, throat cancer, laryngeal cancer, lung cancer and/or other forms of cancer to foreseeable users, such as Mrs. Sarno, when used as intended;

d. in concealing information while affirmatively misrepresenting to Mrs. Sarno and other members of the public in advertising, "informational" communications, sponsorship of sports activities, concerts, and other events, testimony and public statements by officers, agents and employees of the cigarette manufacturers, by labels and otherwise, that the cigarette products manufactured, distributed and/or sold were safe and/or not proven to be dangerous in their ordinary and foreseeable use, which material misrepresentations induced Mrs. Sarno to unknowingly use and/or continue to use Defendant's cigarette products herself and expose herself to the hazards of developing disease and/or suffering injuries including, but not limited to, emphysema, throat cancer, laryngeal cancer, lung cancer and/or other forms of cancer;

e. in failing to test and/or adequately test Defendant's cigarette products before offering them for sale and use by Mrs. Sarno, and other persons similarly situated;

f. in failing to remove and recall all said cigarette products from the stream of commerce and the marketplace upon ascertaining that said products would cause emphysema, throat cancer, laryngeal cancer, lung cancer, lung disorders, and various forms of cancer, some or all of which are permanent and fatal;

14

FILED DATE: 2/3/2026 5:04 PM    2026L001329

g.  in manipulating, failing to reduce and/or eliminating nicotine from Defendant's cigarette products to prevent Mrs. Sarno, who was addicted to the nicotine in Defendant's cigarette products, from quitting and/or reducing consumption;

h.  in including nicotine, or artificially high levels of nicotine, in Defendant's cigarette products to prevent Mrs. Sarno and other persons similarly situated from quitting and/or reducing consumption;

i.  in utilizing tobacco and/or re-constituted tobacco that was high in nitrosamines, nitrates, nicotine, carcinogens, and other substances deleterious, poisonous, and highly harmful when alternative, less dangerous, materials were available to be used in the manufacturing process;

j.  by designing and manufacturing its cigarettes to be inhalable and thus unreasonably dangerous; and/or

k.  by placing additives and ingredients in cigarettes making them easier to inhale and addictive.

39.  Defendant's cigarette products to which Mrs. Sarno was exposed were used in the manner in which they were intended or reasonably foreseeable to Defendants.

40.  Defendant's cigarette products failed to perform as safely as Mrs. Sarno expected they would in that they caused her to develop lung cancer with metastasis to the brain because of her first hand and second hand inhalation of cigarette smoke from Defendant's cigarette products.

41.  Each of the Defendant's cigarette products suffered from a manufacturing and design defect in that they contained arsenic, carcinogens, toxic chemicals, toxic gases, nicotine, tars and other substances which Defendants knew or should have known was extremely harmful to human beings in that exposure to such substances causes injuries and death, and for which there were available materials to substitute and/or manufacturing methods to reduce and/or eliminate these substances in the design and manufacture of the product.

42.  As a direct and proximate result of Defendant's negligent acts and/or omissions, Plaintiff, developed injuries, including but not limited to lung cancer with metastasis to the brain.

FILED DATE: 2/3/2026 5:04 PM    2026L001329

**WHEREFORE,** Plaintiffs, pray for judgment against Defendant PHILIP MORRIS USA INC. for compensatory damages in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) plus costs of suit, pre-judgment interest and for any and all such other further relief as this Court deems just and appropriate.

## COUNT II: NEGLIGENCE (Retailer)

43.   All of the allegations contained in paragraphs 1 through 42 are realleged herein as if fully contained herein.

44.   This count applies to Defendant Walgreen, Co.

45.   At all relevant times, Mrs. Sarno was a smoker who purchased and consumed cigarettes from Defendant Walgreens.

46.   At all relevant times, Defendant Walgreens, knew or should have known that Mrs. Sarno, as a member of the general public for whose use cigarettes were placed into commerce, would be likely to use cigarettes in the manner described in this Complaint.

47.   At all relevant times, Defendant Walgreens, knew or had reason to know of the dangers associated with the manner and circumstances of Mrs. Sarno's foreseeable use of cigarettes.

48.   Tobacco products, such as cigarettes smoked and or consumed by Mrs. Sarno, are not an ordinary or innocuous product.

49.   Cigarettes are dangerous and well recognized to cause the death of fifty percent of consumers who smoke them.

50.   There is no other product in Defendant Walgreens' inventory that is more dangerous or kills more consumers than cigarettes. Defendant Walgreens had a broad range of knowledge about the components of cigarette smoke and how those components were

16

FILED DATE: 2/3/2026 5:04 PM 2026L001329

unreasonably dangerous to its consumers, including that the components of cigarettes smoke contain carcinogenic, toxic and dangerous compounds.

51.   At all relevant times, Defendant Walgreens had knowledge of the defective and unreasonably dangerous nature of the cigarettes it sells to its consumers that far exceeded the knowledge or awareness of the health risks of smoking known by reasonable consumers, including Mrs. Sarno.

52.   At all relevant times, Defendant Walgreens knew or should have known that reasonable consumers, including Mrs. Sarno, did not have the knowledge about how cigarettes were defective that was possessed by Defendant Walgreens.

53.   Defendant Walgreens only recently began disclosing its superior knowledge to the public, long after Mrs. Sarno had already been exposed to the defective and unreasonably dangerous cigarettes sold by Defendant Walgreens.

54.   For example, Defendant Walgreens' own website now details particular, specific and scientific evidence of the dangerous components of the smoke from the cigarettes they sold.



17

FILED DATE: 2/3/2026 5:04 PM 2026L001329

*See* https://staywell.walgreens.com/post/141047756230/how-smoking-affects-your-body (last accessed on November 1, 2018). WALGREEN, CO. now acknowledges that there are 7,000 chemicals in every puff of cigarette smoke from the cigarettes it sells to its consumers. These carcinogenic, toxic and dangerous components in cigarette smoke are not generally known by the reasonable consumer.

    a. Acetone;

    b. Arsenic;

    c. Butane;

    d. Cadmium;

    e. Ammonia;

    f. Toluene; and

    g. Formaldehyde.

55. Mrs. Sarno and other reasonable consumers would not have knowledge of these dangerous chemicals in cigarettes.

56. Defendant Walgreens acknowledges in its website that its knowledge is superior to that of its consumers and candidly admits that particular harms from smoking are not well known or recognized by its consumers. Defendant Walgreens' website states **"Smoking affects you in more ways <u>than you know</u>...":**

18

FILED DATE: 2/3/2026 5:04 PM   2026L001329

**Smoking affects you in more ways than you know...**



**Ears**
Oxygen supply is reduced in the cochlea, an inner ear organ, which may lead to hearing loss.

**Eyes**
Increased risk of cataracts and macular degeneration, which can lead to blindness.

**Mouth**
Mouth sores, ulcers, gum disease, cavities and damaged taste can occur.

**Heart**
Risks of stroke, heart disease and heart attack are increased.

**Lungs**
Risk of emphysema, chronic bronchitis, exacerbations and infections are increased.

**Reproductive Organs (Women)**
Can lead to reduced fertility, failed embryo implantation, early menopause and low estrogen levels, which can cause thinning hair and memory problems; miscarriage, premature birth, stillbirth and illness.

**Reproductive Organs (Men)**
Increased risk of erectile dysfunction and damaged/decreased sperm, which can cause infertility or genetic defects in offspring.

*See* https://staywell.walgreens.com/post/141047756230/how-smoking-affects-your-body (last accessed on November 1, 2018).

57. Defendant W Walgreens' website cites to many diseases not generally known to be caused by smoking cigarettes, including "[i]ncreased risk of cataracts and macular degeneration, which could lead to blindness…[r]isks of stroke, heart disease…[i]ncreased risk of erectile dysfunction and damaged/decreased sperm, which can lead to infertility or genetic defects in offspring." *Id.*

58. Defendant Walgreens' superior knowledge about the unreasonable dangers and defects of cigarettes arose in part from its close relationship with the tobacco industry. Defendant Walgreens was aware as of 1977 at the latest that the tobacco industry including the co-defendant cigarette manufacturers, had engaged in creating a "controversy" to dispute the harmful effects of tobacco products.

19

FILED DATE: 2/3/2026 5:04 PM 2026L001329

59.     Defendant Walgreens was actively engaged with the tobacco industry and the industry's

        co-conspirator, the Tobacco Institute, as shown by correspondence between Defendant

        Walgreens and tobacco industry executives.

60.     For example, Defendant Walgreens reached out to the tobacco industry in March 1977 to

        declare what one tobacco executive described as its "willingness to take part in the smoking

        and health controversy on the side of the tobacco industry." *See* Letter from J. Kendrick

        Wells, III to Horace R. Kornegay dated March 29, 1977, Bates Number 687020794.[2]

61.     Defendant Walgreens' Manager of News and Information Services, David C. Carlson,

        wrote to the president of the Tobacco Institute, Horace R. Kornegay, to explore possibilities

        of using its role as a "health center" to gain support for the tobacco industry:

> As you know, we at Walgreens are exploring the possibilities of an
> information program which will help both the tobacco Industry and
> ourselves. We don't want to step into the middle of a raging controversy,
> but as an established "health center" there are many, many things we can do
> to 'gain and maintain the understanding and support of the public."

        *See* Letter from to Horace R. Kornegay, dated March 16, 1977, Bates Number

        TIMN0083432.

62.     Defendant Walgreens had a "real interest in being of every possible assistance" to the

        tobacco industry "in getting the true word put about." *See* Memorandum dated March 17,

        1977, Bates Number TIMN0083434.

63.     As further example of its close relationship with the tobacco industry and its involvement

        in selling what it knew to be defective and unreasonably dangerous cigarettes to the public,

        including Mrs. Sarno, when Defendant Walgreens became aware in 1993 of litigation

---

[2] Documents referenced by Bates Numbers can be accessed through UCSF Library and Center for Knowledge Management tobacco document archive located at https://www.industrydocuments.ucsf.edu/tobacco/about/.

FILED DATE: 2/3/2026 5:04 PM    2026L001329

involving the tobacco industry's defective cigarette products, it sought indemnification from each of the major cigarette manufacturers for future lawsuits against it. *See* Letter from David L. Grobart to Jackie Gilbert, dated June 2, 1993, Bates Number 2064877537.

64.    Additionally, Defendant Walgreens was told directly by R.J. Reynolds personnel in 2008 that "[n]o tobacco product has been shown to be safe and without risks" and "[r]educing the diseases and deaths associated with the use of cigarettes serves public health goals and is in the best interest of consumers, manufacturers and society". *See* RJRT Presentation, Bates Number 557062850.

65.    These and other contacts that Defendant Walgreens, had with the tobacco industry, including the cigarette manufacturers, show that Defendant Walgreens, was aware of the defective and unreasonably dangerous nature of cigarettes, and that its knowledge was superior to the knowledge of the general public, including Mrs. Sarno.

66.    Indeed, Defendant Walgreens knew as early as the 1990s that its co-defendants manufactured less hazardous cigarette products, like denicotinized cigarettes, low nicotine cigarettes, and non-combustible cigarette products.

67.    Defendant Walgreens chooses to continue selling defective cigarettes to the public despite industry standards and norms set by other national retailers, such as Target and CVS, and the majority of independent pharmacies and drugstores which have ceased cigarette sales.

68.    Tobacco sales in pharmacies directly contradict the pharmacist's code of ethics, which states that pharmacists must be committed to the welfare of their patients and must act with honesty and integrity in professional relationships, avoid actions that compromise dedication to the best interests of their patients. *See* American Pharmacists Association Code of Ethics https://www.pharmacist.com/code-ethics (last accessed on November 1,

FILED DATE: 2/3/2026 5:04 PM    2026L001329

2018). Since 1971, the American Pharmaceutical Association position has recommended against the display and sale of cigarettes in pharmacies, which is in direct contradiction to the role of the pharmacy as a public health facility.

69.    Defendant Walgreens is aware that smoking is the leading cause of death in the United States but chooses to ignore statistics to profit from the sale of defective cigarettes.

70.    Defendant Walgreens continues to sell defective cigarettes to consumers like Mrs. Sarno in order to profit further on smoking cessation devices, such as nicotine replacement patches, gum and lozenges, as well as prescription nicotine replacement therapies, such as varenicline and bupropion.

71.    At all relevant times, Defendant Walgreens had a duty to use reasonable care in placing into the stream of commerce, distributing, marketing, promoting, and selling only products which were reasonably safe for their intended use, and to refrain from selling any product which it knew or should have known was unreasonably dangerous and defective when put to the use for which it was designed, manufactured, distributed, marketed, and sold and which posed an unreasonable threat of bodily harm to consumers, users, bystanders and/or others when it knew or should have known that consumers and other users lacked such knowledge about the defects or dangerous conditions of the product.

72.    In breach of this duty, Defendant Walgreens sold and continued to sell cigarettes to Mrs. Sarno and the general public cigarette products which it knew were defective and unreasonably dangerous.

73.    Had Defendant Walgreens not sold to Mrs. Sarno cigarette products which it knew were defective and unreasonably dangerous, Mrs. Sarno would not have started smoking and/or

22

FILED DATE: 2/3/2026 5:04 PM 2026L001329

smoked less cigarettes and/or stopped smoking at an earlier age, and her risk of injury from cigarettes would have been reduced or possibly eliminated.

74. As a direct and proximate result of the negligence described herein, Plaintiff, developed injuries caused by the consumption of cigarette products purchased from Defendant Walgreens including but not limited to lung cancer with metastasis to the brain. Plaintiff, has sustained bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity to lead and enjoy a normal life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money and aggravation of a previously existing condition. The damages, injuries and losses are permanent and continuing in nature, and Mrs. Sarno has suffered these losses.

**WHEREFORE**, Plaintiffs, pray for judgment against the Defendant WALGREEN, CO. for compensatory damages in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) plus costs of suit, pre-judgment interest and for any and all such other further relief as this Court deems just and appropriate.

## COUNT III: WILFULL and WANTON CONDUCT

75. The allegations contained in paragraphs 1 through 74 are reincorporated and realleged as if fully set forth herein.

76. This count applies to Defendant Philip Morris.

77. Mrs. Sarno smoked Marlboro brand cigarette products that were designed, manufactured, advertised, marketed, distributed, and/or sold by Defendant, which she used in her daily life.

78. Mrs. Sarno was exposed to Defendant's products as a smoker and/or bystander. Each exposure to such cigarette products of Defendant's caused Mrs. Sarno to inhale smoke from said products which caused Mrs. Sarno to develop lung cancer with metastasis to the brain,

23

FILED DATE: 2/3/2026 5:04 PM   2026L001329

which resulted in and directly caused her to suffer severe bodily injuries. Each exposure to such products was harmful and caused or contributed substantially to Mrs. Sarno's injuries. Mrs. Sarno's injuries arose out of, were connected to and incidental to the design, manufacture, advertisement, marketing, distribution, and/or sale by Defendant of its cigarette products.

79. Mrs. Sarno was exposed to and did inhale smoke from cigarette products which were designed, manufactured, advertised, marketed, distributed, and/or sold by Defendant.

80. The damages of Mrs. Sarno are the direct and proximate cause of the willful, wanton and reckless conduct of the Defendant, in that it produced, sold and otherwise placed into the stream of intrastate and interstate commerce, cigarette products which the Defendant knew, or, in the exercise of ordinary care should have known, were deleterious and highly harmful to Mrs. Sarno's health and well-being. The Defendant, prior to selling and/or distributing their cigarette products, to which Mrs. Sarno was exposed, knew that exposure to cigarette smoke was harmful to human beings and that it could cause injuries including, but not limited to, lung cancer, laryngeal cancer, emphysema, COPD, heart disease, other forms of cancer, and/or result in death. The Defendant also knew that Mrs. Sarno and others similarly situated would use and be exposed to their cigarette products in such a way as to cause Mrs. Sarno to inhale the smoke from said products.

81. Defendant's cigarette products, including Marlboro cigarettes, contained latent characteristics and/or latent functional defects at the time they were manufactured and at the time Mrs. Sarno was exposed to them in that said products contained tar, nicotine and other harmful substances which Defendant knew or in the exercise of reasonable care, should have known would cause injuries including, but not limited to, lung cancer, laryngeal cancer, emphysema, COPD, heart

FILED DATE: 2/3/2026 5:04 PM   2026L001329

disease, other forms of cancer, and/or result in death, to those, such as Mrs. Sarno who used and/or was exposed to them.

82.   Defendant knew that its cigarette products would be used by and around Mrs. Sarno without inspection for defects and that any such inspection would not have advised Mrs. Sarno of the fact that the Defendant's cigarette products could cause the injuries which he suffered. Such facts made Defendant's cigarette products unreasonably dangerous in that Mrs. Sarno was not apprised of, could not and would not contemplate the danger and/or the extent of the danger of contracting the injuries as a result of her exposure to the inhalation of the cigarette smoke of Defendant's cigarette products which she used or was exposed to.

83.   Mrs. Sarno alleges that there were methods of design and manufacture available and/or known to Defendant and unknown to her which could have been used by Defendant in the design and manufacture of its cigarette products to which Mrs. Sarno was exposed to make such products less dangerous. Defendant was in the business of designing, manufacturing, advertising, marketing, distributing and/or selling cigarette products during the times pertinent to this suit, and knew that Mrs. Sarno and others similarly situated would encounter its cigarette products, and would be exposed to the inhalation of the smoke from said products which resulted in the development of fatal and life-threatening injuries including, but not limited to, lung cancer with metastasis to the brain. Defendant acted willfully, wantonly, recklessly and consciously disregarded the health and life of consumers including the Plaintiff herein in all the following respects, same being the proximate cause of Mrs. Sarno's injuries, disabilities which acts have continued to the present time:

   a.   in designing and developing cigarette products that were more mild, had better taste and contained nicotine so that foreseeable users, such as Mrs. Sarno, would find smoking Defendant's products pleasurable which in turn would lead the Plaintiff, and others similarly situated, to begin smoking and/or to increase consumption;

FILED DATE: 2/3/2026 5:04 PM    2026L001329

b.  in failing to develop and utilize alternative design, manufacturing methods and/or materials to reduce and/or eliminate harmful materials and/or characteristics from the cigarette products Defendant designed, manufactured, advertised, marketed, distributed and/or sold;

c.  in continuing to manufacture, distribute and sell cigarette products when Defendant knew at the time of said manufacture, distribution and/or sale that such products could cause, and in fact were more likely to cause, injuries including, but not limited to, emphysema, throat cancer, laryngeal cancer, lung cancer and/or other forms of cancer to foreseeable users, such as Mrs. Sarno, when used as intended;

d.  in concealing information while affirmatively misrepresenting to Mrs. Sarno and other members of the public in advertising, "informational" communications, sponsorship of sports activities, concerts, and other events, testimony and public statements by officers, agents and employees of the cigarette manufacturers, by labels and otherwise, that the cigarette products manufactured, distributed and/or sold were safe and/or not proven to be dangerous in their ordinary and foreseeable use, which material misrepresentations induced Mrs. Sarno to unknowingly use and/or continue to use Defendant's cigarette products herself and expose herself to the hazards of developing disease and/or suffering injuries including, but not limited to, emphysema, throat cancer, laryngeal cancer, lung cancer and/or other forms of cancer;

e.  in failing to test and/or adequately test Defendant's cigarette products before offering them for sale and use by Mrs. Sarno, and other persons similarly situated;

f.  in failing to remove and recall all said cigarette products from the stream of commerce and the marketplace upon ascertaining that said products would cause emphysema, throat cancer, laryngeal cancer, lung cancer, lung disorders, and various forms of cancer, some or all of which are permanent and fatal;

g.  in manipulating, failing to reduce and/or eliminating nicotine from Defendant's cigarette products to prevent Mrs. Sarno, who was addicted to the nicotine in Defendant's cigarette products, from quitting and/or reducing consumption;

h.  in including nicotine, or artificially high levels of nicotine, in Defendant's cigarette products to prevent Mrs. Sarno and other persons similarly situated from quitting and/or reducing consumption;

i.  in utilizing tobacco and/or re-constituted tobacco that was high in nitrosamines, nitrates, nicotine, carcinogens, and other substances deleterious, poisonous, and highly harmful when alternative, less dangerous, materials were available to be used in the manufacturing process;

j.  by designing and manufacturing its cigarettes to be inhalable and thus unreasonably dangerous; and/or

k. by placing additives and ingredients in cigarettes to making them easier to inhale and addictive.

84. The Defendant's cigarette products to which Mrs. Sarno was exposed were used in the manner in which they were intended or reasonably foreseeable to Defendant.

85. The Defendant's cigarette products failed to perform as safely as Mrs. Sarno expected it would in that they caused her to develop lung cancer with metastasis to the brain because of her inhalation of cigarette smoke from Defendant's cigarette products.

86. Each of the Defendant's cigarette products suffered from a manufacturing and design defect in that they contained arsenic, carcinogens, toxic chemicals, toxic gases, nicotine, tars and other substances which Defendant knew or should have known was extremely harmful to human beings in that exposure to such substances causes injuries and death, and for which there were available materials to substitute and/or manufacturing methods to reduce and/or eliminate these substances in the design and manufacture of the product.

87. As a direct and proximate result of Defendant's willful, wanton, reckless acts and/or omissions and conscious disregard for the health and life of its consumers, including Plaintiff, developed injuries, including but not limited to, lung cancer with metastasis to the brain.

**WHEREFORE,** Plaintiff, prays for judgment against Defendant PHILIP MORRIS USA INC. for compensatory damages in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) plus costs of suit, pre-judgment interest and for any and all such other further relief as this Court deems just and appropriate.

## COUNT IV: STRICT LIABILITY

88. The allegations contained in paragraphs 1 through 87 are reincorporated and are realleged as if fully set forth herein.

FILED DATE: 2/3/2026 5:04 PM  2026L001329

FILED DATE: 2/3/2026 5:04 PM    2026L001329

89. This count is against Defendant Philip Morris.

90. Defendant was and has been a designer, manufacturer, advertiser, distributor and/or seller of cigarette products, including but not limited to Marlboro cigarettes.

91. The products complained of were cigarette products designed, manufactured, advertised, distributed, and/or sold by Defendant and used by and/or in the vicinity of Mrs. Sarno.

92. The aforesaid products were distributed, supplied, sold and/or otherwise placed into the stream of commerce, and/or caused to be placed into the stream of commerce, by the Defendant.

93. Mrs. Sarno was exposed to Defendant's cigarette products over many years during which time smoke from Defendant's cigarette products was inhaled by Mrs. Sarno, which caused her to develop lung cancer with metastasis to the brain.

94. At the time Defendant designed, manufactured, advertised, marketed, distributed and/or sold the aforesaid cigarette products, such products were expected to, and did, reach Mrs. Sarno in a condition without substantial change from that in which such products were when within the possession of Defendant.

95. The Defendant's cigarette products were in a condition unreasonably dangerous to users and/or bystanders, such as Mrs. Sarno and said products were expected to, and did, reach Mrs. Sarno without substantial change affecting that condition.

96. The Defendant's cigarette products were, by reason of their design, in a condition unreasonably dangerous to users and/or bystanders, such as Mrs. Sarno, and said products were expected to, and did, reach Mrs. Sarno without substantial change affecting that condition.

97.   Defendant's cigarette products were in a defective condition, unreasonably dangerous, in that

those products:

   a.   by design contained tar, nicotine, carcinogens, toxic gases, and other substances
        deleterious, poisonous, and highly harmful to Mrs. Sarno;

   b.   contained tar, nicotine, carcinogens, toxic gases, and other substances deleterious,
        poisonous, and highly harmful when and after it became feasible to design and
        manufacture reasonably comparable products not containing those substances or
        containing less of them;

   c.   failed to filter the harmful substances so that during ordinary use, such materials
        would not be liberated into the air and/or breathed by the smoker such as Mrs.
        Sarno;

   d.   through the use of filters, manufacturing methods, engineering methods and/or
        materials utilized were designed in such a way to make smoking Defendant's
        cigarette products more tasteful, pleasurable and less likely to trigger the smoker's
        own biological self defense mechanisms which otherwise may have limited and/or
        altered the smoker's behavior in such a way that the smoker may have smoked less,
        inhaled less deeply or not at all;

   e.   utilized tobacco and/or re-constituted tobacco that was high in nitrosamines,
        nitrates, nicotine, carcinogens, and other substances deleterious, poisonous, and
        highly harmful when alternative, less dangerous, materials were available to be
        used in the manufacturing process;

   f.   the nature and degree of the danger of Defendant's cigarette products were beyond
        the expectation of the ordinary consumer when used as intended or in a reasonably
        foreseeable manner;

   g.   by designing and manufacturing their cigarettes to be inhalable and thus unreasonably
        dangerous; and/or

   h.   by placing additives and ingredients in cigarettes to making them easier to inhale and
        addictive.

98.   Mrs. Sarno, unaware of the defective and unreasonably dangerous condition of the

Defendant's cigarette products, and at a time when such products were being used for the

purposes for which they were intended, was exposed to and breathed smoke from Defendant's

cigarette products.

29

FILED DATE: 2/3/2026 5:04 PM   2026L001329

99. Defendant knew that its cigarette products would be used without inspection for defects and, by placing them on the market, represented that they would be safe.

100. Mrs. Sarno was unaware of the hazards and defects in the cigarette products of the Defendant, to-wit: That exposure to said products would cause Mrs. Sarno to develop lung cancer with metastasis to the brain which made said products unsafe for use.

101. Mrs. Sarno was caused to contract lung cancer with metastasis to the brain.

102. As a direct and proximate result of the strict liability of the Defendant, Plaintiff, developed injuries, including but not limited to lung cancer with metastasis to the brain..

**WHEREFORE**, Plaintiff, prays for judgment against Defendant PHILIP MORRIS USA INC. for compensatory damages in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) plus costs of suit, pre-judgment interest and for any and all such other further relief as this Court deems just and appropriate.

## COUNT V: FRAUDULENT CONCEALMENT

103. The allegations contained in paragraphs 1 through 102 are reincorporated and realleged as if fully set forth herein.

104. This count is against Defendant Philip Morris.

105. Defendant and other cigarette manufacturers had a duty to disclose material information regarding cigarettes' health hazards because they were in a superior position to consumers, including Mrs. Sarno. This superior position was established due to the following:

    a. As the designers, developers and manufacturers of their cigarette products, Defendant and other cigarette makers solely possessed knowledge of the ingredients in their products, which they kept strictly confidential from the public;

    b. As the designers, developers and manufacturers of their cigarette products, Defendant and other cigarette makers were solely aware of additives to their cigarette products and the amounts of such additives, which they kept strictly confidential from the

30

FILED DATE: 2/3/2026 5:04 PM    2026L001329

public;

c. As the designers, developers and manufacturers of their cigarette products, Defendant and other cigarette makers were solely aware of the effects that additives to their cigarette products had on consumers, which they kept strictly confidential from the public;

d. Defendant and other cigarette makers undertook research regarding the addictive nature of their cigarettes and knew that nicotine was highly addictive. Moreover, they knew that their cigarettes are highly addictive due to the amount of nicotine they chose to maintain in each cigarette;

e. Defendant and other cigarette makers advertised and sold filtered, low-tar, and mild cigarettes products, which touted or implied health benefits. However, Defendant knew that these purported benefits were illusory, and that the public—even the US government and physicians—were being misled by their false promises;

f. Defendant and other cigarette makers undertook internal research regarding the health effects of their cigarettes and knew that cigarette use caused cancer. More importantly, they knew that consumers, including Mrs. Sarno, were not aware of this scientific determination, and that the public's ignorance was the driving force behind their cigarette sales and growing revenue;

g. The dangers of smoking are not open and obvious to consumers, especially young consumers, because the harm could occur and accumulate imperceptibly for decades before resulting in cancer;

h. The significant increase in cancer caused by cigarettes is detectable only in aggregate over decades of statistical studies, which the tobacco industry persistently discredited and publicly disputed over Plaintiff's lifetime;

i. The tobacco industry had superior knowledge not only to consumers but even to the FDA in that it knew the FDA's methodology of measuring tar from filtered cigarettes did not accurately measure tar-intake in actual consumer use; and

j. The addictiveness of nicotine at the level that Defendant put into each cigarette was known to the tobacco manufacturers, and specifically designated by the manufacturers to maintain sales, but was impossible for consumers to detect.

106.  Defendant and other cigarette makers also assumed a duty to disclose material information to their consumers, including Mrs. Sarno. Their assumption of duty began with the Frank Statement and continued and was reaffirmed their duty repeatedly throughout Mrs. Sarno's life, as exhibited by the following conduct:

31

FILED DATE: 2/3/2026 5:04 PM    2026L001329

a. As part of the Frank Statement published in over 400 newspapers across the United States, the tobacco industry stated, "we believe the products we make are not injurious to health." The companies "accept[ed] an interest in people's health as a basic responsibility, paramount to every other consideration in our business" and pledged "aid and assistance to the research effort into all phases of tobacco use and health" thereby assuming a duty to disclose to the public of any hazards discovered that might affect smokers' health.

b. In addition to the Frank Statement above, the Defendant individually or through the acts of its agents, employees and representatives, further assumed a duty, or acknowledged their duty to disclose, and not fraudulently conceal the harms and addictive nature of smoking cigarettes through various statements to the public or through internal correspondence, including but not limited to the following:

   i. Shortly after the Frank Statement was published, George Weissman, a Philip Morris Vice President, through a publicized speech in 1954, told the public that "if we had any thought or knowledge that in any way we were selling a product harmful to consumers, we would stop business tomorrow."

   ii. Robert N. Dupuis, Chairman of the Industry Technical Group of the Tobacco Industry Research Committee, stated in 1955 on See It Now on CBS, regarding harmful components in smoke: "As we find these components we publish the results of our work in technical journals which are available to any scientist in any part of the world. So far we've found none that give us any cause for concern. *If we do find any that we consider harmful, and so far we have not, we will remove these from smoke and still retain the pleasure of your favorite cigarette*." [Emphasis added].

   iii. On June 7, 1955, Timothy Hartnett, Chairman of the Tobacco Industry Research Committee, repeated that the industry had "accepted an interest in people's health as a basic responsibility paramount to every other consideration in our business. And that's where we stand today."

   iv. Lorillard's 1953 annual report told its shareholders: "[w]e believe Lorillard products are not injurious to anyone's health, but that we accept as an inherent responsibility of our corporate citizenship the obligation to make the public's health our business."

   v. In 1971, Joseph Cullman III, the Chairman and Chief Executive Officer of Philip Morris, appeared on Face the Nation on CBS and stated, "when as and if any ingredient in cigarette smoke is identified as being injurious to human health we are confident that we can eliminate that ingredient."

   vi. Internally, the industry recognized it assumed a duty to inform the public of hazards associated with cigarettes. On April 4, 1978, Ernest Pepples, General Counsel for B&W, sent a letter to J.E. Edens at B&W Industries describing the

FILED DATE: 2/3/2026 5:04 PM    2026L001329

purpose of the CTR and its statements to the public: "Originally, the CTR was organized as a public relations effort. The industry told the world CTR would look at the diseases which were being associated with smoking. *There was even a suggestion by our political spokesmen that if a harmful element turned up the industry would try to root it out. The manufacturer has a duty to know its product...*" [Emphasis added].

vii. Horace Kornegay, President and Executive Director of the Tobacco Institute, stated on the NBC Today Show on January 10, 1979, stated "if we know what the criminal element is...then every effort will be made to remove it from the product."

viii. RJ Reynolds president Gerald H Long, in a May 19, 1986, interview for Insight Magazine asserted that if he ever "saw or thought there were any evidence whatsoever that conclusively proved that, in some way, tobacco was harmful to people, and I believed it in my heart and my soul, then I would get out of the business."

c. In 1962, The Tobacco Institute, the public relations successor to the TIRC, began to publish many advertisements, including one entitled "Some frank words about Smoking and Research," which stated in part:

i. "Most scientists recognized long ago that there are no simple, easy answers in cancer research. They know that the answers to fundamental questions about causation can come about only through persistent scientific research."

ii. "The tobacco industry supports and cooperates with all responsible efforts to find the facts and bring them to the public."

iii. "In that spirit, we are cooperating with the U.S. Surgeon General and his special study group appointed to evaluate presently available research knowledge. Similar cooperation has been offered to the American Medical Association's proposed study."

iv. "We know we have a special responsibility to help scientists determine the facts about tobacco use and health."

v. "The industry accepted this responsibility in 1954 by establishing the Tobacco Industry Research Committee to provide research grants to scientists in recognized research institutions. This research program is continuing on an expanded and intensified scale."

d. In 1966 the Tobacco Institute issued a press release where it stated on behalf of the industry: "Scientists throughout the world are continuing to investigate to learn the full facts about 'tar' and nicotine, and about questions concerning tobacco and health. The tobacco industry is supporting much of this research and will continue to do so."

33

FILED DATE: 2/3/2026 5:04 PM 2026L001329

e.  The TIRC was formed in 1954 by cigarette manufacturers, including the Defendant in this case, with the pledge to provide aid and assistance to the research into all phases of cigarette use and health, expressly undertaking an interest in health as their basic responsibility paramount to every other consideration thereby affirmatively assuming a duty to disclose any adverse information regarding the health hazards of smoking. However, despite these promises, the TIRC and later CTR concealed information regarding the lack of bona fide research being done on the health hazards of smoking, and the lack of funds being provided for research by the TIRC and CTR into the health hazards of cigarettes. Joint industry efforts undertaken by the TIRC and the CTR were neither disinterested nor objective. Industry documents, recently revealed, show that CTR functioned not for the promotion of scientific goals, but for the purposes of public relations, politics, and positioning for litigation. The TIRC and CTR were used to support an industry strategy of denying or creating doubt that smoking causes disease.

f.  The tobacco industry and its organizations invested an enormous amount of time, effort and money to curate a decades-long promise, which instilled a false belief in the public that Defendant and fellow cigarette makers proactively sought the truth regarding smoking's health hazards and would discontinue a product that they knew to be cancer-causing. This false belief was passed down, overtly or implicitly, from adults to children through generations of American consumers, including Mrs. Sarno.

107.  In making the aforementioned half-truths, suppressing the totality of material facts and passing them off as the entirety of the truth regarding what it knew about the health consequences of smoking and the addictive nature of cigarettes, Defendant also created in itself a duty to disclose all material information in its possession.

108.  Due to the Defendants' superior position, assumption of duty and creation of a duty to disclose all material information, Mrs. Sarno placed her trust and confidence in Defendants to disclose all of the harmful effects of its cigarettes. Mrs. Sarno and others similarly situated justifiably relied upon the cigarette manufacturers, including the Defendants herein, the TIRC and the CTR to disseminate knowledge and information which they possessed regarding the health hazards of cigarettes, especially after the industry chose to voluntarily speak regarding its cigarette products, efforts to support research into the harms and addictive nature of smoking, ensuring the public it would disclose and remove any

FILED DATE: 2/3/2026 5:04 PM    2026L001329

harmful elements of tobacco smoke it discovered, and even remove cigarettes from the market or stop business if it found them harmful to human health. Mrs. Sarno also reasonably and justifiably relied on Defendants to disclose information including but not limited to the fact that smoking causes cancer, that the nicotine level designed into each of Defendants cigarettes would cause strong addiction, and that filter, low-tar and mild cigarette designs do not actually reduce the risk of smoking.

109. However, rather than disclosing the truth, Defendants, other cigarette makers, TIRC and TI collectively undertook a misinformation campaign to fraudulently induce the public and Mrs. Sarno to believe that they were in favor of protecting consumers' health, and that the issues of nicotine addictiveness and the carcinogenic nature of tobacco were unproven by scientific research.

110. Beginning at an exact time unknown to Mrs. Sarno and continuing even today, the cigarette manufacturers, including Defendant herein, have carried out, and continue to carry out a campaign designed to deceive the public, Mrs. Sarno, physicians, the government and others as to the true dangers of smoking cigarettes. Defendant and other cigarette manufacturers carried out such scheme by concealing their knowledge concerning the following material information:

    a.  the results of their own research into the health dangers posed by smoking cigarettes, including but not limited to the results of mouse skin painting experiments which proved that Defendant's cigarettes did in fact contain carcinogenic materials;

    b.  their failure to conduct adequate testing to determine whether cigarette smoking did lead to cancer and other diseases;

    c.  the importance of animal experiments in determining the ability of cigarettes to cause disease in humans;

FILED DATE: 2/3/2026 5:04 PM    2026L001329

d. the importance of epidemiological evidence in determining the ability of cigarettes to cause disease in humans;

e. the addictive and dependence producing nature of nicotine as contained in cigarette smoke;

f. the risks of contracting cancer, including but not limited to laryngeal cancer, lung cancer, esophageal cancer, other head and neck cancers, tongue/oral cavity cancer, bladder cancer and other forms of cancer, from smoking cigarettes;

g. the dose-response relationship between various carcinogenic substances contained in cigarette smoke and the risk of contracting cancer, including but not limited to lung cancer;

h. that reducing the number of cigarettes smoked per day would greatly reduce the risk of contracting a cigarette related disease;

i. that smoking in excess of 5 cigarettes per day would likely lead to an addiction to or dependence on nicotine;

j. the use of ammonia technology and/or certain tobacco blends to boost the ph of the cigarette smoke so as to increase the ratio of the "free base" form of nicotine (which is more easily absorbed by the smoker) to the acid salt form of nicotine (which is less readily absorbed) so as to allow for greater absorption of nicotine by the smoker at lower levels of total dose;

k. the use of tobacco high in nitrosamines, a potent carcinogen not found in green tobacco leaf but created during the tobacco curing process;

l. the lack of credible scientific studies linking other human endeavors such as air pollution, viruses and/or road tar to the increasing rate of lung cancer in this country;

m. that cessation of smoking, while reducing the risk of contracting certain cigarette related diseases, does not eliminate all risk;

n. that cigarette smoking permanently alters certain receptor cites in the brain for nicotine making it more likely such individual will become or continue to be addicted to and/or dependent upon nicotine;

o. that use of mild tobaccos, re-constituted tobacco, tobacco casings and flavorants in the manufacture of Defendant's cigarettes led to a cigarette less likely to trigger the smoker's own biological self defense mechanisms, the smoke of which was easier to inhale, inhale more deeply and hold in the lungs for a longer period of time which resulted in increased doses of carcinogens, such as PAHs and nitrosamines, and

FILED DATE: 2/3/2026 5:04 PM    2026L001329

nicotine for the smoker even at lower levels of machine measured tar and nicotine yields;

p. that smoke from Defendant's cigarette products caused damage to a smoker's respiratory tract, including but not limited to the ciliary escalator system utilized by the body to remove foreign particles from the lungs increasing the risk of the smoker of contracting various respiratory ailments including but not limited to lung cancer, emphysema, and several other lung diseases;

q. that the carcinogens in cigarette smoke lead to the development of genetic mutations within the lungs of smokers making such smokers more likely to develop lung cancer when exposed to carcinogens, tumor promoters and/or tumor initiators including but not limited to those such as PAHs and nitrosamines found within cigarette smoke.

r. that switching to filtered, low tar, low nicotine and/or "light" cigarettes would not be less hazardous because smokers would smoke more and/or alter their smoking habits such that their intake of tar, nicotine and other harmful substances would not be reduced;

s. by continuing even today to fraudulently market and sell multiple brands as "filtered" causing smokers to wrongly believe that filtered cigarettes reduce the harms of smoking based on the implication of filtration of smoke and therefore relative safety compared to unfiltered cigarettes  However, Defendant and the industry know filtered cigarettes provide no health benefit as proven by numerous reliable epidemiologic studies that have shown that filtered cigarettes are no safer than non-filtered cigarettes; and/or

t. that the Federal Trade Commission ("FTC") method of measuring "tar & nicotine" levels underestimated and did not accurately reflect the levels of tar and nicotine actually delivered to an actual smoker.

111. The cigarette manufacturers, including Defendant herein, have concealed vast amounts of knowledge regarding the health hazards of cigarettes and their addictive nature over the course of the last 65 years. Plaintiff is unable to allege in full all such knowledge that the cigarette manufacturers and their co-conspirators, THE TOBACCO INSTITUTE, INC. ("TI") formed in 1958, TOBACCO INDUSTRY RESEARCH COMMITTEE ("TIRC") formed in 1954, and COUNCIL for TOBACCO RESEARCH ("CTR") formed in 1964 and previously known as the TIRC, as well as attorneys and law firms retained by the Defendant and have withheld

FILED DATE: 2/3/2026 5:04 PM    2026L001329

and/or failed to release over the last almost 65 years both because she does not have access to this information, and because to allege each and every such concealment of material fact herein would entail hundreds or even thousands of pages of pleadings; indeed, it is the cigarette manufacturers themselves, including Defendant herein, which have this knowledge and information, and are in the best position to know the contents of each and every such concealed fact.

112.   The cigarette manufacturers, including Defendants herein, concealed their actual knowledge concerning their own negative health and addiction research results and their manipulation and control of the nicotine content of their products to induce the public, including Mrs. Sarno, to smoke and create and perpetuate smokers' addiction to cigarettes.  The success of the conspiracy depended upon the concerted action of the cigarette manufacturers (in a so-called "gentleman's agreement"), for otherwise the revelation by one company of what it knew about the health consequences of smoking and/or the availability of a "safe" or "safer" cigarette and/or the addictive nature of the manufacturers' cigarette would have thwarted the conspiracy.

113.   As early as 1953, Dr. Ernst Wydner had published an article titled Experimental Production of Carcinoma with Cigarette Tar in the journal Cancer Research. In his experiments he painted cigarette tar on the backs of mice which then developed tumors on their backs. In 1954 LIGGETT & MYERS, assuming that whatever cigarettes were used in Dr. Wydner's study were not CHESTERFIELD or L & M, decided to repeat Dr. Wydner's experiments with their cigarettes with, hopefully, better results. In a 1954 memo written by F. R. Darkis, an executive for LIGGETT & MYERS, Mr. Darkis writes:

FILED DATE: 2/3/2026 5:04 PM    2026L001329

> "If Chesterfield turn out to be negative, and X (used by Wydner) as positive, it would then be possible to say, that by using Dr. Wydner's techniques, Chesterfield did not produce cancer in mice."

Of course, when the experiments were finished in 1955 the mice had developed tumors and so had rabbits that were similarly tested. The results of these experiments would not become public until many years later.

114.    A confidential "limited" LIGGETT & MYERS document dated March 15, 1961, states, in part: (L&M - A Perspective Review)

    a.    There are biologically active materials present in cigarette smoke. These are a) cancer causing b) cancer producing, c) poisonous ...

    b.    What the causative precursors in tobacco are is not well known...So there is the suggestion of two mechanisms for causative agent products...but what good is this? We've known this for several years - so what?

This document was written by an industry consultant for LIGGETT & MYERS. This industry consultant conducted animal research from 1954-1984 for LIGGETT & MYERS. This memo contained material facts known to and concealed by the Defendants since at least 1961 and unknown to Mrs. Sarno.

115.    In 1964, TIRC changed its name to CTR, and was joined by Defendants, LIGGETT & MYERS. Defendants, R.J. REYNOLDS TOBACCO COMPANY, and PHILIP MORRIS USA INC. were founding members of the TIRC/CTR. The TIRC had been formed in 1954 with the pledge to provide aid and assistance to the research into all phases of cigarette use and health, expressly undertaking an interest in health as their basic responsibility paramount to every other consideration thereby affirmatively assuming a duty to disclose any adverse information regarding the health hazards of smoking.

116.    Despite their "promise" which created the illusion that scientific research into the dangers of smoking was being conducted, the results of which would be made public, they concealed

FILED DATE: 2/3/2026 5:04 PM 2026L001329

information regarding the lack of bona fide research being done by the TIRC and CTR into the health hazards of smoking, and the lack of funds being provided for research by the TIRC and CTR into the health hazards of cigarettes, which was the purported purpose for which the TIRC and CTR were established.

117.    Joint industry efforts undertaken by the TIRC and the CTR were neither disinterested nor objective. Industry documents, recently revealed, show that CTR functioned not for the promotion of scientific goals, but for the purposes of public relations, politics, and positioning for litigation. The TIRC and CTR were used to support an industry strategy of denying or creating doubt that smoking causes disease. This material information was concealed from Mrs. Sarno and the public. For example, in 1967, G.F. Todd of the CTR wrote a letter to Mr. Addison Yeaman. Mr. Yeaman was the vice president and general counsel of BROWN & WILLIAMSON TOBACCO COMPANY. In his letter, Todd observed:

> "The only real difficulties that we encountered arose out of the unavoidable paradox at the center of our operations - namely that, on the one hand the manufacturers control TIRC's operations and do not accept that smoking has been proved to cause lung cancer while, on the other hand, TIRC's research program is based on the working hypothesis that this has been sufficiently proved for research purposes. In addition, the Council senior scientists accept the causation theory...We have not yet found the best way of handling this paradox."

118.    In a July 17, 1963, memo Addison Yeaman, vice president and general counsel of BROWN & WILLIAMSON TOBACCO COMPANY and later president and CEO of the CTR writes:

> "The TIRC cannot, in my opinion, provide the vehicle for such research (discover the carcinogens in cigarette smoke). It was conceived as a public relations gesture and ... it has functioned as a public "relations operation.""

Clearly, despite what the industry had publicly represented as being the purpose for which the TIRC and later CTR were formed, industry insiders knew it was nothing more than a "public relations" sham.

FILED DATE: 2/3/2026 5:04 PM    2026L001329

119. In that same July 17, 1963, memo Addison Yeaman, vice president and general counsel of BROWN & WILLIAMSON TOBACCO COMPANY and later president and CEO of the CTR writes:

> "Moreover, nicotine is addictive. We are, then in the business of selling nicotine, an addictive drug effective in the release of stress mechanisms ... But cigarettes - we assume the Surgeon General's Committee to say - despite the beneficent effect of nicotine, have certain unattractive side effects:
>
> > 1)They cause, or predispose to, lung cancer.
> >
> > 2)They contribute to certain cardiovascular disorders.
> >
> > 3)They may well be truly causative in emphysema, etc, etc."

120. The 1964 Surgeon's General Report was not issued for another 6 months. The 1964 Report did not have sufficient evidence to conclude that nicotine was addictive, but the cigarette industry certainly did. The industry also understood what the findings of the Surgeon General would be regarding causation and disease even before those findings were made public. Despite what the industry told the public the industry clearly understood that nicotine was addictive, and cigarettes were a cause of lung cancer and other diseases.

121. The cigarette manufacturers, including Defendants herein, knew for decades that the "tar and nicotine levels", as measured by the so-called Cambridge Filter Method or FTC method, were inaccurate – and seriously underestimated the levels of poisons delivered into the lungs. Yet they continued to tout the tar and nicotine numbers on cigarette packs and marketing materials, inducing smokers to believe lower tar and lower nicotine cigarettes were safer, until 2008 when the Federal Trade Commission ultimately rescinded its guidance concerning tar and nicotine yields.

122. The cigarette manufacturers, including Defendant herein, continue even today to fraudulently market and sell multiple brands as "filtered" knowing that smokers wrongly believe that

FILED DATE: 2/3/2026 5:04 PM 2026L001329

filtered cigarettes reduce the harms of smoking and despite knowing internally that such cigarettes are just as addictive, dangerous, and deadly as non-filtered cigarettes.

123.  Due to the above misconduct, Mrs. Sarno could not have discovered the truth about cigarettes and was prevented from making a reasonable inquiry. Mrs. Sarno did not have access to the Defendants research, information and/or knowledge about the true dangers of the cigarette products that was concealed, hidden and/or suppressed by Defendant and co-conspirators, did not have the resources or ability to perform such research or otherwise learn this information, and could not have discovered through reasonable diligence the information about the true dangers of cigarettes that was known and concealed by Defendant.

124.  As a result, when Mrs. Sarno began and continued to smoke Defendants' cigarettes, she was not told the material information listed in paragraph 110.

125.  Defendants withheld and concealed the materially factual information to induce the Plaintiff and others to falsely believe that cigarettes were not dangerous and to induce them to smoke and become addicted to the nicotine in their cigarette products.

126.  Mrs. Sarno justifiably relied upon Defendant's fraudulent concealment of the materially actual information to believe that cigarettes were not in fact addictive and that they were not harmful.

127.  Had the Defendants not for many years concealed and/or suppressed its knowledge of the dangers of their cigarette products (or spread false information designed to cause confusion) from Mrs. Sarno and the public, including that the products caused cancer and other serious health issues, Mrs. Sarno would not have started smoking, or stopped earlier and her risk of injury from cigarettes, including lung cancer with metastasis to the brain, would have been eliminated.

FILED DATE: 2/3/2026 5:04 PM    2026L001329

128.  Had the Defendant not concealed and/or suppressed its knowledge of the addictiveness of its cigarette products from Mrs. Sarno and the public, Mrs. Sarno would not have started smoking or would have stopped smoking at an earlier age or significantly reduced her cigarette intake, and her risk of injury from cigarettes, including lung cancer with metastasis to the brain.

129.  As a direct and proximate result of the aforementioned concealment and/or suppression of material information by the cigarette manufacturers, including Defendant herein and its co-conspirators, Mrs. Sarno , smoked and/or continued to smoke and was otherwise exposed to Defendant's cigarette products which caused her to develop injuries, including but not limited to lung cancer with metastasis to the brain.

WHEREFORE, Plaintiffs, pray for judgment against Defendant PHILLIP MORRIS USA INC. for compensatory damages in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) plus costs of suit, pre-judgment interest and for any and all such other further relief as this Court deems just and appropriate.

## COUNT VI: CONSPIRACY TO COMMIT FRAUDULENT CONCEALMENT

130.  The allegations in paragraphs 1 through 129 are reincorporated and realleged as if fully contained herein.

131.  This count is against Defendants Philip Morris, Reynolds and Liggett.

132.  The Defendants, along other tobacco manufacturers, and the Tobacco Industry Research Committee (TIRC), the Council for Tobacco Research (CTR), and Tobacco Institute (TI), along with attorneys and law firms retained by the Defendants unlawfully agreed to conceal or omit, and did in fact conceal or omit, information regarding the health effects of cigarettes and or their addictive nature with the intention that smokers and the public would rely on this information to their detriment. The Defendants agreed to execute their scheme

43

FILED DATE: 2/3/2026 5:04 PM    2026L001329

by performing the above-mentioned unlawful acts and/or by doing lawful acts by unlawful means.

133.    The Defendants along with other entities including the TIRC/CTR, TI and persons including their in-house lawyers and outside retained counsel entered into a conspiracy in the 1950s to conceal the harms of smoking cigarettes.

134.    The Defendants, through its employees, agents and representative made numerous public statements from 1953 through 2000 directly denying the actual health harms and addictive nature of smoking cigarettes.

135.    During its four decade history, the TIRC/CTR never acknowledged that smoking had been proven to be a cause of multiple cancer types or other serious diseases in smokers, the addictive nature of nicotine, and the fact that light cigarettes are no safer than regular cigarettes, even though the vast majority of CTR funded scientists themselves believed that cigarette smoking was responsible for a wide range of serious, and often fatal, injuries including multiple cancers, understood the addictive nature of nicotine and also knew that light cigarettes were no safer than regular cigarettes.

136.    After the year 2000, the Defendants and its co-conspirators continued their conspiratorial acts in furtherance of the conspiracy related to the harms of smoking including but not limited to the following acts:

   a.    Marketing and/or advertising filters as safer or less hazardous to health than non-filtered cigarettes;

   b.    Marketing and/or advertising low tar cigarettes as safer or less hazardous to health;

   c.    Marketing and/or advertising lights and ultra-lights cigarettes as safer or less hazardous to health;

   d.    Continuing to market and/or advertise lights, ultra-lights, and low tar cigarettes under color brand name descriptors such as "Gold" and "Silver" and informing smokers

44

FILED DATE: 2/3/2026 5:04 PM    2026L001329

"pack will be changing, but your cigarette will stay the same" following the federal ban on the use of "lights," "mild" and "low" tar descriptors in 2010; and

    e. Knowingly concealing from the public that filtered, low tar, lights and ultra-lights cigarettes were no safer or even less hazardous that other cigarettes.

137.    The Defendant and its co-conspirators as it relates to their acts in furtherance of their conspiracy as alleged in this complaint continues through the present.

138.    The concealed and omitted information described in the aforementioned and preceding paragraphs was material information.

139.    Mrs. Sarno relied both directly and indirectly to her detriment upon the Defendant's and other co-conspirators' concealment and omission of such material information. Mrs. Sarno, during the course of her smoking history, heard some or all these false and misleading statements and/or similar statements made directly or indirectly by the Defendant and/or its co-conspirators, believed some or all of the Defendant and its co-conspirators' false and misleading statements, and relied to her detriment by smoking and continuing to smoke based on such false and misleading statements.

140.    Had Defendant and its co-conspirators not concealed and omitted the aforementioned information from Mrs. Sarno and the public, Mrs. Sarno would have not started smoking and/or reduced the number of cigarettes and/or stopped smoking at an earlier age, and her risk of injury from cigarettes would have been reduced or eliminated.

141.    Each Defendant's acts and omissions, and those of TIRC/CTR, TI and other tobacco manufacturers, as well as their in-house and retained counsel, and all of them, constitute a successful conspiracy to commit fraud.

142.    Conspiracy is but a vehicle for imputing the tortious acts of one co-conspirator to another. Each act done in pursuance of a conspiracy by one of several conspirators is an act for which

each is jointly and severally liable. Once the existence of a conspiracy is established, and a party's membership in the conspiracy is established, that party will be liable for the acts of all members of the conspiracy in furtherance of the conspiracy regardless of the nature of its own actions. One who knowingly joins a conspiracy, even at a later date, takes the conspiracy as he/she/it finds it and is liable for all acts previously or subsequently done in pursuance of the conspiracy. Accordingly, Defendant as members of a civil conspiracy is liable for all acts and/or omissions of any co-conspirator done in pursuance of the conspiracy.

143.    As a direct and proximate result of the fraudulent concealment of the aforementioned conspiracy to conceal and/or suppress material information by the cigarette manufacturers, including Defendant and its co-conspirators, MRS. SARNO , smoked and continued to smoke and/or was otherwise exposed to Defendant's cigarette products which caused injuries, including but not limited to lung cancer with metastasis to the brain.

        **WHEREFORE**, Plaintiffs, pray for judgment against Defendants, PHILIP MORRIS USA INC., R.J. REYNOLDS TOBACCO COMPANY and LIGGETT GROUP LLC, for compensatory damages in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) plus costs of suit, pre-judgment interest and for any and all such other further relief as this Court deems just and appropriate.

## COUNT VII:  FRAUDULENT MISREPRESENTATION (Manufacturer)

144.    The allegations contained in paragraphs 1 through 143 are reincorporated and realleged as if fully set forth herein.

145.    This count is against Defendant Philip Morris.

146.    Beginning at an exact time unknown to Mrs. Sarno, and continuing even today, the cigarette manufacturers, including Defendants herein, have carried out, and continue to carry out a

FILED DATE: 2/3/2026 5:04 PM    2026L001329

FILED DATE: 2/3/2026 5:04 PM    2026L001329

campaign designed to deceive the public, Mrs. Sarno, the government and others as to the health hazards of smoking and the addictive nature of smoking, through fraudulent statements, false statements and/or misrepresentations of material facts in interviews, testimony and print, radio and television advertising.

147.    The cigarette manufacturers, including Defendants herein, made literally hundreds of misrepresentations to Mrs. Sarno and others similarly situated over the course of the last 50 years. Mrs. Sarno is unable to allege in full the thousands of pre-1968 advertisements, and the continuing press releases, testimony by cigarette manufacturers' officers and employees before Congress and other governmental entities, etc., that the cigarette manufacturers and their co-conspirators, TOBACCO INDUSTRY RESEARCH COMMITTEE ("TIRC") formed in 1954, the TOBACCO INSTITUTE, INC. ("TI") formed in 1958, and COUNCIL for TOBACCO RESEARCH ("CTR") formed in 1964 and previously known as the TIRC, have prepared, participated in, given, and released over the last almost 50 years both because he does not have access to this information, and because to allege each and every such misrepresentation and/or false statement here would entail hundreds or even thousands of pages of pleadings; indeed, it is the cigarette manufacturers themselves, including Defendants herein, which have this knowledge and information, and are in the best position to know the contents of each and every such misrepresentation and/or false statement.

148.    The cigarette manufacturers, including Defendants herein, carried out their campaign of fraud, false statements and/or misrepresentations in at least the following ways:

   a.   they agreed falsely to represent to Mrs. Sarno and others similarly situated that questions about smoking and health would be answered by an unbiased, and trustworthy source;

   b.   they misrepresented and confused the facts about the health dangers of smoking, including addiction. The cigarette manufacturers claimed, falsely, that there is

47

FILED DATE: 2/3/2026 5:04 PM    2026L001329

insufficient "objective" research to determine if cigarette smoking causes disease and that cigarettes are not addictive;

c. the cigarette manufacturers, including Defendant herein, used lawyers to misdirect what purported to be objective scientific research, yet maintained to Mrs. Sarno and others similarly situated that such objective scientific research was being conducted and that the results of such research would be made public;

d. to discourage meritorious litigation by Mrs. Sarno injured due to cigarettes, they engaged in "scorched earth" litigation tactics in combination with suppressing and distorting evidence to protect the cigarette manufacturers, including Defendants herein, existence and profits;

e. by designing, selling and marketing so called "Light" cigarettes as being substantially lower in tar and nicotine than regular, or non-light cigarettes and therefore healthier or safer for consumers. Defendant knew that the system to measure the tar and nicotine was neither a valid nor reliable way to measure the amount of tar and nicotine inhaled by an actual smoker. Notwithstanding same, the Defendant marketed its "Light" cigarettes to consumers as a safer alternative. Defendant manipulated the design of cigarettes to produce test results that were artificially low. Furthermore, Defendant knew that "Light" cigarette smokers may compensate to obtain the same level of tar or nicotine as non-light cigarettes either by taking more puffs on each cigarette, by taking larger, longer or deeper puffs, or by smoking more cigarettes;

f. by continuing to fraudulently market and sell "mild", "low tar", and "light" cigarettes through 2010 despite knowing they were no safer than full flavor cigarettes and knowing consumers perceived them as safer. The cigarette manufacturers, including Defendant herein, were ultimately prohibited by Congress from marketing "mild", "low tar", and "light" cigarettes when Congress passed the Family Smoking Prevention and Tobacco Control Act, Public Law 111-31 (June 22, 2009), which became effective on June 22, 2010. Despite the congressional ban, the cigarette manufacturers, including Defendants herein, have continued to market and sell even today the same "mild", "low tar", and "light" cigarettes, only now these cigarettes are marketed with a new coloring scheme instead of the banned light descriptors. These cigarettes are the same or substantially the same cigarettes as the pre-prohibition cigarettes. Consumers often perceive the color descriptors on packaging as suggesting less harmful to smoke than regular or full flavor brands. The cigarette manufacturers, including Defendant herein, is thus able to continue fraudulently misrepresenting the "light", "low tar" and "mild" cigarette marketing the ban was designed to prevent; and

g. by continuing even today to fraudulently market and sell multiple brands as "filtered" knowing that smokers wrongly believe that filtered cigarettes reduce the harms of smoking. The word "filter" implies filtration of the smoke and therefore relative safety. However, Defendant and the industry knew filtered cigarettes provide no health benefit as proven by numerous reliable epidemiologic studies that have shown that filtered cigarettes are no safer than non-filtered cigarettes.

48

FILED DATE: 2/3/2026 5:04 PM   2026L001329

149. Cigarette manufacturers, including the Defendant, knew that cigarettes were dangerous and addictive. It became the practice, purpose and goal of the cigarette manufacturers to question any scientific research which concluded that cigarettes were a health hazard. They did this through media campaigns, mailings to doctors and other scientific professionals and through testimony before governmental bodies.

150. Joint industry efforts undertaken by the TIRC and the CTR were neither disinterested nor objective. Industry documents, recently revealed, show that CTR functioned not for the promotion of scientific goals, but for the purposes of public relations, politics, and positioning for litigation. The TIRC and CTR were used to support an industry strategy of denying or creating doubt that smoking causes disease. For example, in 1967, G.F. Todd of the CTR wrote a letter to Mr. Addison Yeaman. Mr. Yeaman was the vice president and general counsel of BROWN & WILLIAMSON TOBACCO COMPANY. In his letter, Todd observed:

> "The only real difficulties that we encountered arose out of the unavoidable paradox at the center of our operations - namely that, on the one hand the manufacturers control TRC's operations and do not accept that smoking has been proved to cause lung cancer while, on the other hand, TRC's research program is based on the working hypothesis that this has been sufficiently proved for research purposes. In addition, the Council senior scientists accept the causation theory...We have not yet found the best way of handling this paradox."

151. Despite Defendants and the industry's promises "to help scientists determine the facts about tobacco use and health" and claiming to support research concerning tobacco and health, Defendants and the industry did not conduct the research they represented that they would conduct.

FILED DATE: 2/3/2026 5:04 PM   2026L001329

152.   Instead of conducting the research it promised to do, Defendants focused its efforts on attacking health-related research that showed the dangers of smoking to keep alive a public controversy over whether tobacco smoke was harmful.

153.   The industry paid for advertisements in major newspapers to attack legitimate research. For example, in 1969 the American Tobacco Company, a successor to R.J. Reynolds Tobacco Company stated in the New York Times, "[w]e believe the anticigarette theory is a bum rap."

154.   Defendants continued to avoid studying the health effects of smoking while at the same time continuing to publicly insist on the need for more research.

155.   The industry's purpose was to give smokers what one industry executive called a "crutch" that would justify their continued smoking.

156.   Instead of focusing their efforts on health issues as it represented it would do, Defendants focused on research into modifying their cigarettes to increase their addictiveness.

157.   Rather than making its research public as it had represented it would do, Defendants publicly denied and suppressed the results of its research.

158.   Defendants continued to engage in a course of conduct where it represented to the public many times throughout the years that they would conduct research and disclose results to the public, while at the same time either hiding any potentially damning results or not conducting bona fide research at all.

159.   Throughout the years, Defendants has continued to state that cigarettes were not dangerous, and it would either remove harmful constituents or stop making cigarettes altogether. Some examples include:

FILED DATE: 2/3/2026 5:04 PM    2026L001329

A 1970 advertisement from the Tobacco Institute said: "[t]he Tobacco Institute believes the American public is entitled to complete, authenticated information about cigarette smoking and health."

In 1971, Joseph Cullman, Chairman of Philip Morris, stated on Face the Nation, "we do not believe that cigarettes are hazardous; we don't accept that."

In 1972 Philip Morris vice president James Bowling repeated the company's promise to consumers two decades earlier that "if our product is harmful, we'll stop making it."

Bowling repeated the company's position on smoking and health in a 1976 interview when he noted: "from our standpoint, if anyone ever identified any ingredient in tobacco smoke as being hazardous to human health or being something that shouldn't be there, we could eliminate it. But no one ever has."

In a 1978 magazine interview William Dwyer, vice president of the Tobacco Institute, stated: "we take the view that the best science can say is that cigarette smoking may be hazardous. And then it may not be."

A 1978 Philip Morris publication entitled "Facts About the Smoking Controversy" stated: "scientists have not determined what causes cancer...cigarettes have never been proven unsafe."

In 1984, Ed Horrigan, Chairman of R.J. Reynolds spoke on Nightline and told the public, "It is not known whether cigarettes cause cancer. It has not been causally established."

In 1985, R.J. Reynolds took out advertisements in major newspapers and magazines which stated: "We believe in science. That is why we continue to provide funding for independent research into smoking and health...Science is science. Proof is proof. That is why the controversy over smoking and health remains an open one."

In 1988, in response to the United States Surgeon General's report that cigarettes are addictive, and nicotine is the drug in tobacco that causes addictions, issuing a press release knowingly and disingenuously stating "Claims that cigarettes are addictive is irresponsible and scare tactics."

In 1994, CEOs from the seven largest cigarette companies, including Defendants herein, knowingly providing false and misleading testimony under oath before the United States Congress that it had not been proven that cigarettes were addictive, caused disease, or caused one single person to die.

51

FILED DATE: 2/3/2026 5:04 PM   2026L001329

160.  Defendants continued to make these and similar statements well into the 1990s with the goal of convincing smokers to keep smoking, not reducing their smoking, and/or not quitting.

161.  Defendants and the tobacco industry promoted their message through many press releases and statements and through less obvious methods, including influencing the content of apparently neutral articles and cultivating opinion leaders who would convey their message. Defendants and the tobacco industry communicated their message through all forms of available media, including newspapers, magazines, and television.

162.  Industry spokespersons appeared on news shows, on commercials and public television to state that the evidence concerning the health effects of tobacco was based primarily on statistical relationships and that there was no proof that a specific tobacco component caused a specific disease, and that cigarette smoking was not addictive.

163.  Cigarette manufacturers when sued denied that cigarettes were addictive and claimed that smoking was a matter of free choice and that smokers could quit smoking if they so wanted.

164.  The acts, false statements and/or misrepresentations which were made and/or caused to be made by the cigarette manufacturers, including Defendants herein, and its co-conspirators were made and/or caused to made with knowledge of their falsity and/or in reckless disregard of the truth.

165.  The aforementioned acts, false statements and/or misrepresentations were made and/or caused to be made by the cigarette manufacturers, including Defendants herein, and its co-conspirators for the purposes of inducing Mrs. Sarno and others similarly situated to rely on such false statements and/or misrepresentations to induce persons such as Mrs. Sarno to smoke, fail to quit or reduce consumption.

FILED DATE: 2/3/2026 5:04 PM   2026L001329

166. Defendants knew that Mrs. Sarno, as well as other customers, did not hold sufficient information to understand or appreciate the dangers of the cigarettes that he smoked.

167. These misrepresentations and false statements about the health hazards of cigarettes also include the following statements which were heard, read, and relied upon by Plaintiff, who remembered these statements or substantially similar statements, made by the Defendants, its co-conspirators, and their spokesmen and women:

   a. Claims by the Tobacco Institute that the American Cancer Society withheld data linking cigarettes and cancer and attacking the industry's position that there is no proof that cigarettes smoking causes lung cancer. Chicago Tribune, May 1, 1970.

   b. Ad by the Tobacco Institute criticizing the American Cancer Society and urging consumers not to believe claims that cigarettes cause cancer. Chicago Tribune May 6, 1970.

   c. Ad by the Tobacco Institute restating its contention "that there is no laboratory proof of a connection between cigarette smoking and lung cancer." Chicago Tribune May 6, 1970.

   d. R,J. Reynolds Tobacco Company ad "Can we have an open debate about smoking?" shedding doubt upon research connecting cigarette smoking and cancer. Chicago Tribune January 31, 1984.

   e. "It is not known whether cigarettes cause cancer, it has not been casually established." Edward Horrigan, President of R.J. Reynolds Tobacco Company on ABC Nightline 1984.

   f. "Despite all of the research to date there has been no causal link established [between cigarette smoking and cancer.]" Edward Horrigan, President of R.J. Reynolds Tobacco Company on ABC Nightline 1984.

   g. "As a matter of fact, there are studies that while we are accused of being associated with heart disease, there have been studies conducted over 10 years that would say again that science is still puzzled over these forces." Edward Horrigan, President of R.J. Reynolds Tobacco Company on ABC Nightline 1984.

   h. "There is absolutely no proof that cigarettes are addictive." Edward Horrigan, CEO of R.J. Reynolds, Congressional Testimony 1982.

   i. "Is it your position that it has never been proven that cigarette smoking has caused a single person to die? That is my position, yes." James Johnston, R.J. Reynolds Tobacco Company, Congressional Testimony 1994.

FILED DATE: 2/3/2026 5:04 PM    2026L001329

168.    The aforementioned acts, false statements and/or misrepresentations which were made and/or caused to be made by or on behalf of Defendants and the other cigarette manufacturers were made to induce the public and Mrs. Sarno to believe that cigarettes were not addictive or harmful to their health, to start smoking and become addicted to nicotine.

169.    The aforementioned acts, false statements and/or misrepresentations which were made and/or caused to be made by or on behalf of Defendants and the other cigarette manufacturers, either directly or indirectly including the Defendants herein, and their co-conspirators were reasonably and justifiably relied upon by Mrs. Sarno, resulted in Mrs. Sarno being unaware of the extent of the danger of the Defendants' cigarette products, the addictive nature of Defendants' cigarette products, and that filtered cigarettes were just as dangerous as regular and/or unfiltered cigarettes.

170.    Furthermore, Mrs. Sarno relied on all the Defendants' false and misleading marketing and advertising of cigarettes about the health hazards of cigarettes, including, but are not limited to, the following:

    a.    False and misleading marketing tactics regarding "filtered" cigarettes which caused Mrs. Sarno to smoke a filtered cigarette and continue to smoke a filtered cigarette.

    b.    False and misleading marketing tactics aimed at African Americans.

    c.    False and misleading marketing tactics regarding "low tar" and "mild" cigarettes which caused Mrs. Sarno to switch to light cigarettes for a time.

    d.    False and misleading print advertisements including the following specific advertisements, along with other similar advertisements:

FILED DATE: 2/3/2026 5:04 PM 2026L001329







171. Mrs. Sarno, during the course of her smoking history, heard some or all of the false or misleading statements and/or similar statements made directly or indirectly by the Defendants and its co-conspirators, including advertisements and other marketing materials falsely representing or suggesting that cigarettes were not as dangerous from a health standpoint than they actually are, that there was no link between cigarettes and various types of cancer, that cigarettes was not addictive, and that light cigarettes were safer and less hazardous than other cigarettes.

172. Believing and relying upon these false and misleading statements made by the Defendants in its direct advertisements to consumers and by the Defendants and co-conspirators in

FILED DATE: 2/3/2026 5:04 PM    2026L001329

interviews, testimony and publications, Mrs. Sarno did not recognize that cigarettes were addictive, that they posed significant health risks not limited to but including the risk of developing lung cancer, or that "light" and "mild" cigarettes were not less dangerous than regular cigarettes.

173.    In further reliance upon the false and misleading statements made by the Defendants in its direct advertisements to consumers and by the Defendants and co-conspirators in interviews, testimony and publications, Mrs. Sarno switched to light and mild cigarettes, believing them to reduce any potential health risk connected to cigarette smoking.

174.    The aforementioned acts, false statements and/or misrepresentations which were made and/or caused to be made by the cigarette manufacturers either directly or indirectly, including Defendants herein, were justifiably relied upon by Mrs. Sarno, resulting in her being unaware of the extent of the danger of the Defendant's cigarette products, the addictive nature of Defendants' cigarette products and that light cigarettes were not safer than other cigarettes. Such acts, false statements and/or misrepresentations were made by the Defendants who had knowledge superior to Mrs. Sarno regarding the health aspects of cigarettes including their addictive nature.

175.    Had Defendants not made the aforementioned false statements and/or misrepresentations about the dangers of the cigarette products to Mrs. Sarno and the public, Mrs. Sarno would have not started smoking, stopped smoking at an earlier age, and/or reduced the number of cigarettes that she consumed, and her risk of injury from cigarettes, including lung cancer, COPD, atherosclerosis , would have been reduced or eliminated.

176.    As a direct and proximate result of the aforementioned acts, false statements and/or fraudulent misrepresentations which were made and/or caused to be made by the cigarette manufacturers,

56

including Defendants herein, Mrs. Sarno smoked, continued to smoke and/or was otherwise exposed to Defendant's cigarette products which caused her to develop injuries, including but not limited to lung cancer with metastasis to the brain.

**WHEREFORE,** Plaintiffs, pray for judgment against Defendant PHILIP MORRIS USA INC. for compensatory damages in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00), plus costs of suit, pre-judgment interest and for any and all such other further relief as this Court deems just and appropriate.

## COUNT VIII: CONSPIRACY TO COMMIT FRAUDULENT MISREPRESENTATION

177. The allegations in paragraphs 1 through 176 are realleged and reincorporated as if fully set forth herein.

178. This count is against Defendants Philip Morris, Reynolds, and Liggett.

179. The Defendants, along with the other cigarette manufacturers referenced in paragraph 19 and 20, and the Tobacco Industry Research Committee (TIRC), the Council for Tobacco Research (CTR), and Tobacco Institute (TI), along with attorneys and law firms retained by the Defendants unlawfully agreed to commit, and did commit, overt acts, false statements and/or fraudulent misrepresentations concerning information regarding the health effects of cigarettes or their addictive nature with the intention that smokers and the public would rely on this information to their detriment. The Defendants agreed to execute the scheme by performing the above-mentioned unlawful acts and/or by doing lawful acts by unlawful means.

180. During its four-decade history the TIRC/CTR never acknowledged that smoking had been proven to be a cause of cancer or other serious diseases in smokers while maintaining publicly that smoking had not been proven to cause disease, even though the vast majority

57

FILED DATE: 2/3/2026 5:04 PM    2026L001329

of CTR funded scientists themselves believed that cigarette smoking was responsible for a wide range of serious, and often, fatal diseases.

181.    The acts, false statements and/or fraudulent misrepresentations described in the preceding paragraphs were material information.

182.    Mrs. Sarno relied to her detriment upon the acts, false statements and/or fraudulent misrepresentations of such information. Mrs. Sarno, during the course of her smoking history heard, some or all the false or misleading statements and/or similar statements made directly or indirectly by the Defendants and its co-conspirators, believed some or all of the Defendants' and their co-conspirators false or misleading statements and relied to her detriment and continued to smoke cigarettes based on such false or misleading statements.

183.    Had Defendants or its co-conspirators not made the aforementioned false statements and fraudulent misrepresentations of such information to Mrs. Sarno, she would have reduced the number of cigarettes that she consumed and/or stopped smoking at an earlier age, and her risk of injury from cigarettes, including lung cancer with metastasis to the brain, would have been reduced or eliminated.

184.    Defendants acts and omissions, and those of the CTR, TIRC and TI, and other cigarette manufacturers, and in-house lawyers and outside retained counsel and all of them, constitute a successful conspiracy to commit fraudulent misrepresentation.

185.    Conspiracy is but a vehicle for imputing the tortious acts of one co-conspirator to another. Each act done in pursuance of a conspiracy by one of several conspirators is an act for which each is jointly and severally liable. Once the existence of a conspiracy is established, and a party's membership in the conspiracy is established, that party will be liable for the acts of all members of the conspiracy in furtherance of the conspiracy regardless of the nature of his

FILED DATE: 2/3/2026 5:04 PM 2026L001329

own actions. One who knowingly joins a conspiracy, even at a later date, takes the conspiracy as he/she/it finds it and is liable for all acts previously or subsequently done in pursuance of the conspiracy. Accordingly, each Defendant as a member of a civil conspiracy is liable for all acts and/or omissions of any co-conspirator done in pursuance of the conspiracy.

186. As a direct and proximate result of the aforementioned conspiracy to commit acts and make false statements and/or fraudulent misrepresentations by the cigarette manufacturers, including Defendant and its co-conspirators, Mrs. Sarno continued to smoke and/or was otherwise exposed to cigarette products which caused her to develop injuries, including but not limited to lung cancer with metastasis to the brain.

**WHEREFORE**, Plaintiff, prays for judgment against Defendants, PHILIP MORRIS USA INC., R.J. REYNOLDS TOBACCO COMPANY and LIGGETT GROUP LLC for compensatory damages in an amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00) plus costs of suit, pre-judgment interest and for any and all such other further relief as this Court deems just and appropriate.

## COUNT IX: LOSS OF CONSORTIUM

187. Plaintiff, John P. Sarno, restates and realleges Paragraphs 1 through 186 as though fully set forth herein.

188. John P. Sarno is the duly wedded husband of Deborah M. Sarno.

189. As a direct and proximate result of one or more of the foregoing negligent, willful and wanton acts and/or omissions, fraudulent behavior and/or strict liability of the Defendants Plaintiff, John P. Sarno, has sustained a loss of consortium and companionship of his wife, Deborah M. Sarno.

FILED DATE: 2/3/2026 5:04 PM  2026L001329

**WHEREFORE,** Plaintiff, John P. Sarno, prays for judgment in his favor and against the Defendants, PHILIP MORRIS USA INC., R.J. REYNOLDS TOBACCO COMPANY and LIGGETT GROUP LLC, for compensatory damages in an amount in excess of Fifty Thousand Dollars ($50,000.00) plus costs of suit, pre-judgment interest and for any and all such other further relief as this Court deems just and appropriate.

**JURY DEMAND**

Plaintiffs respectfully requests the Court for a trial by jury.

Dated: February 3, 2026

Respectfully submitted,

DEBORAH M. SARNO and JOHN P. SARNO,

MEYERS & FLOWERS, LLC

*/s/ Peter J. Flowers*
Peter J. Flowers, One of Plaintiffs' Attorneys

Peter J. Flowers, Esq.
Craig D. Brown, Esq.
Jonathan P. Mincieli, Esq.
Thomas M. Connelly, Esq.
MEYERS & FLOWERS, LLC
3 North Second Street, Suite 300
St. Charles, Illinois 60174
(630) 232-6333
pjf@meyers-flowers.com
cdb@meyers-flowers.com
jpm@meyers-flowers.com
tmc@meyers-flowers.com

Chicago Office:
225 W. Wacker, Suite 1515
Chicago, IL 60606

and

Michael A. Alvarez
Alex Alvarez Jr.
Andi Hernandez

FILED DATE: 2/3/2026 5:04 PM    2026L001329

THE ALVAREZ LAW FIRM
3251 Ponce De Leon
Coral Gables, FL 33156
(305) 444-7675
Michael@talf.law
Alexjr@talf.law
Andi@talf.law
Tobacco@integrityforjustice.com